**[Cite as *State v. Contreras*, 2024-Ohio-5972.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                        Court of Appeals No.  L-23-1293

      Appellant                                  Trial Court No.  CR0202103011

v.

Anthony Contreras                            **DECISION AND JUDGMENT**

      Appellee                                   Decided:  December 20, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellant.

Joseph C. Patituce and Megan M. Patituce, for appellee.

* * * * *

**ZMUDA, J.**

## I.  Introduction

{¶ 1} This matter is before the court on the state of Ohio's interlocutory appeal from the Lucas County Court of Common Pleas judgment of December 8, 2023, disqualifying assistant prosecutor, Joseph Gerber, in the underlying case against appellee, Anthony Contreras. Finding no error, we affirm.

## II. Facts and Procedural History

{¶ 2} On December 16, 2021, Contreras was indicted on one count of aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(a) and (B), a felony of the third degree, and one count of vehicular assault in violation of R.C. 2903.08(A)(2)(b) and (C), a felony of the fourth degree. The charges stemmed from a car accident on October 6, 2021, which resulted in the death of one person and the serious injury to another person. The state alleged that Contreras caused the accident through his reckless driving, with recklessness demonstrated by conduct immediately preceding the crash, including running a red light within 1,000 feet of the crash, driving nearly twice the posted speed limit, or 76 m.p.h., and zigzagging through traffic while passing vehicles at a high rate of speed. Contreras entered not guilty pleas to the charges.

{¶ 3} The accident occurred near an intersection that was close to the border between Toledo and Sylvania Township and involved Contreras' 2016 Audi S7 and the decedent's 2011 Chevy Equinox. After the initial collision, Contreras' Audi struck a third vehicle, a 2017 Chevy Traverse, which was stopped at the traffic light. Immediately following the collision, both Toledo and Sylvania Township 911 services received numerous calls, reporting the crash.

{¶ 4} On January 13, 2022, the state indicated in a filing that it served a subpoena for relevant 911 audio and call logs from Sylvania Township Police/Communications Section. On February 9, 2022, the state indicated in a filing that it served a subpoena for

2.

relevant 911 audio and call logs from Toledo Police/Communications Section. Much discovery was conducted in the case, and the state filed numerous notices of production of supplemental discovery, producing medical records, expert reports, technical reports, and investigative reports, along with other discovery. The state also requested reciprocal discovery from Contreras, and Contreras filed notices of production of reciprocal discovery.

{¶ 5} The parties engaged in extensive motion practice concerning discovery disputes, and the trial date was continued several times. On March 20, 2023, counsel for Contreras filed a motion to withdraw, citing a breakdown in the attorney/client relationship. New counsel entered an appearance for Contreras and filed a demand for discovery, seeking production that included a copy of all witness statements in any format, a list of all witnesses the state intended to call at trial, all reports from law enforcement pertaining to the case, and all evidence, notice of evidence, and Bill of Particulars provided to prior defense counsel.

{¶ 6} The matter eventually proceeded to trial on October 23, 2023. On October 24, 2023, an issue arose concerning production of a 911 call. While the transcript of the 2023 trial is not part of the record in this appeal, the trial court described the issue at a subsequent hearing as originating with Prosecutor Gerber's request for stipulation to the 911 call, leading defense counsel to question why the 911 caller's name did not appear on the state's witness list. After listening to the 911 call, defense counsel claimed the call

3.

was never produced to the defense. With apparent acknowledgement by the prosecution that evidence was not produced, the trial court granted the defense motion for a mistrial.

{¶ 7} On November 30, 2023, prior to the second trial, Gerber contacted a potential witness of the accident, C.J., by telephone. Gerber did not record his conversation or have a witness present for the interview. This was also the state's first contact with C.J. regarding her 911 call reporting the accident. Following the interview, Gerber emailed defense counsel, indicating C.J. stated she witnessed Contreras' car "fly" through the intersection at a high rate of speed and strike the decedent's vehicle. Defense counsel was concerned, as C.J.'s statement materially differed from the 911 caller's statement connected to the phone number, which indicated the caller "did not witness the accident, just the tail end" and "they hit each other hard."

{¶ 8} On December 1, 2023, Contreras moved to disqualify Gerber, citing the likelihood of Gerber being a necessary witness at trial for purposes of impeaching C.J.'s testimony. The state filed a brief in opposition to disqualification and Contreras filed a reply brief. The parties each cited the analysis required for disqualification based on the authority of *Baldonado v. Tackett,* 2009-Ohio-4411 (6th Dist.), arguing their respective positions regarding disqualification and relying on *Baldonado* and Prof.Cond.R. 3.7(a).

{¶ 9} On December 4, 2023, the trial court held a hearing on the motion. At hearing, Contreras argued that Gerber's contact with C.J. was an initial interview of a witness who had not previously given a statement to an investigator, either written or

4.

oral, and Gerber obtained information from C.J. that, if C.J. were permitted to testify, would "miraculously" fit the state's theory of the case. Contreras argued that the 911 call that resulted in a mistrial in the previous trial, or the call made by "Terri," was from the same phone number attributed to C.J. and indicated Terri or C.J. was now recalling an opposite version of events. In response, Gerber argued that C.J. was not the same caller as "Terri," and that C.J. "could be a call that I cannot now locate" due to the record retention period for Toledo and Sylvania Township police having passed. Gerber had no explanation for the identical phone numbers connected to both "Terri" and C.J. Gerber also did not produce a recording of the 911 call he believed was made by C.J.

{¶ 10} The trial court noted the confusion with names and the number of calls produced to Contreras, in the following exchange:

> THE COURT: That was not – you have now introduced a third name. So you have introduced a third name into this case, because when you were on the record the last time in the request before we brought the witnesses – or the jury up was you turned nonchalantly to Defense and said, the only preliminary thing we have to speak about is whether or not you will stipulate to the 911 call.
> At which point [defense counsel] gave dialogue as to what he normally does, but that he found that in this particular scenario the witness in the 911 call was not listed on your witness list, which caused us to go deeper into a dialogue.
> At which point you both produced two separate transcripts with two separate named people on it, one named Terri, the other lady I don't recall, but I don't believe it was [C.J.]
> At which point when we listened to the audio tape the 911 operator referenced extemporaneously that a significant amount of calls were coming in about this accident.
> At which point argument was made on the – on the record as to why the Defense did not have access to any of these 911 calls, tapes, or transcripts, and you were all tasked with going back to clarify where the 911 calls were coming in.

You made reference on the record that in this particular accident zone one half of the street was Sylvania, one half of the street was Toledo, and that there may be some basis as to how records were kept.

When we mistried this case over a month ago the Court would have expected that due diligence on 911 was done. I asked my staff last week, just anticipating that this case could go sideways again, that she reach out to you to make sure that you were all on track and that the discovery issues we dealt with in the last date were dealt with.

At which point there was a response from one of you that this new witness was spoken to.

I was alarmed that based on the 911 operator statement that there was multiple calls coming in that if we were still only dealing with two it was unlikely that we had all the people.

Now, you've now interjected a third name. Who is [C.J.]?

MR GERBER: One of the numbers that's in one of the incident detail reports that – I think there are three. I think there are three numbers between both reports.

One number is for the Terri individual that is on the 911 call that was provided to Defense on that day of trial that I didn't know had not been provided before.

[C.J.], who I spoke to, and then I believe it's [L.R.] – [L.R.], who has been a witness on the State's witness list for a long time.

{¶ 11} In response to Gerber's statements, Contreras' counsel indicated that the number Gerber listed for C.J. was the same phone number at issue in the previous trial for "Terri." The trial court recessed the hearing to permit Gerber and defense counsel to listen to the audio and compare the transcripts, to clear up confusion. Upon reconvening, defense counsel indicated the matter had "actually become more complicated and more important for the disqualification." Contreras' counsel stated:

The Prosecution is accurate that this tape, which was provided to us that caused the mistrial, in a brief passing moment the caller is asked her name. She quickly says Terri.

6.

That number also goes – as to when you look at the call log that comes in there are two calls that come in. The Prosecutor now has talked to the only - this is the only person who has talked to the witness. Who was in the car with you? Was there actually a second call? This is why we have investigators make phone calls.

Contreras' counsel informed the trial court that the person on the call, for which a recording was produced in discovery, was named Terri. The phone number, however, belongs to C.J., and does not belong to Terri.

{¶ 12} Gerber acknowledged that two, separate incident detail reports existed but he believed the defense had the same reports and was "welcome to contact these witnesses as well." Gerber did not dispute the fact that he was the only person to interview C.J., or that he was the first person to take C.J.'s statement, after her 911 call. Gerber also recognized the proposed stipulation at the prior trial did not match the discovery received by the defense, referencing the "Terri" 911 recording. Gerber characterized his interview of C.J. as trial preparation, and opposed disqualification based on characterization of the matter as a *Brady* issue. Gerber also argued that he notified the defense of C.J.'s statements out of courtesy, because it was trial preparation, in case C.J.'s statements constituted *Brady* material. Gerber stated that he had no 911 recording for C.J. or other, additional individuals named in the incident detail reports, due to the passage of time.

{¶ 13} The trial court identified issues concerning the 911 recordings and transcripts, or incident detail reports. First, the trial court noted that the incident detail

7.

reports were formatted as transcripts and only a synopsis of what the caller reported and not meant to be an accurate representation of what was recorded in the original 911 calls. The transcripts did not correspond with the audio, and it was not clear if the names listed were callers or dispatchers. Second, the phone number Gerber used to speak with C.J. was the same phone number defense counsel contacted at the time of the mistrial, when the phone number was associated with "Terri." When the trial court asked Gerber to clarify details in the incident detail reports, Gerber professed no understanding of the reports and could provide no explanation as to how the reports linked "Terri" and C.J. to the same phone number. Of note, Gerber did not dispute that the same number was associated with both "Terri" and C.J., but instead stated that the 911 recording by "Terri" was not made by C.J., based on his knowledge. Finally, the trial court noted that because the state did not obtain all the recordings referenced by the incident detail reports, the audio for a separate "C.J." call was no longer available and could not be produced.

{¶ 14} In addition to the issues arising from the confusion over the phone number linked to both "Terri" and C.J., the defense counsel sought disqualification based on Gerber's "initial interview of a witness who had never spoken to an investigator, Detective, or police officer." Contreras' counsel argued, "Because [Gerber] spoke directly to a witness who had never given a written statement before, the Defense – if that witness testifies, again, miraculously fitting the sixth Bill of Particulars exactly, I am entitled to call Mr. Gerber to the stand, interrogate him in front of the jury as to questions asked,

8.

why he asked the questions, what training he has in asking those questions, what his goal was, what the setting was, all the means and modes I would normally be able to Cross Examine any Detective who conducted an investigation."

{¶ 15} On December 5, 2023, the state filed a notice of supplemental discovery, noting the witness statement of C.J. was produced to the defense by leaving a copy for counsel in the prosecutor's office.

{¶ 16} On December 6, 2023, the trial court granted the motion to disqualify Prosecutor Gerber for Contreras' case, by written opinion. The trial court considered the factors under *Baldonado v. Tackett,* 2009-Ohio-4411 (6th Dist.), which applied Prof.Cond.R. 3.7 but used "the two-part analysis developed in prior case law [applicable to prior disciplinary rules governing the issue]: '(1) first, determine whether the attorney's testimony is admissible and, if so, (2) determine if disqualification is necessary and whether any of the exceptions to [Prof.Cond.R.3.7] are applicable.'" *Baldonado* at ¶ 20, citing *Horen v. City of Toledo Public School Dist.,* 2007-Ohio-6883, ¶ 22 (6th Dist.).

{¶ 17} As to the first prong of the analysis, the trial determined Gerber's testimony would be admissible under Evid.R. 616(A), and that the defense could reasonably decide to call Gerber as a witness based on his initial interview of a witness who had never spoken to an investigator, detective, or police. Specifically, the trial court found that Gerber's testimony would be admissible to explore the reasons for a change in C.J.'s story for "bias, prejudice, interest, or any motive to misrepresent," should the state decide

9.

to call C.J. as a witness. The trial court limited consideration of disqualification, moreover, finding Gerber could be called to testify only if the state called C.J. to testify.

{¶ 18} In addition to the preliminary finding of admissibility, the trial court determined that disqualification was necessary as Gerber would be a necessary witness for purposes of impeachment should C.J. testify, part of the analysis under the second prong of *Baldonado*. The trial court determined C.J.'s proposed testimony would establish the element of "recklessly" for aggravated vehicular homicide. The trial court found that, "unless in the unlikely circumstance that [C.J.] admits that her statement to Mr. Gerber was untrue, the only apparent way for Defendant to attempt to impeach [C.J.]'s testimony on the 'recklessly' element would be to examine Mr. Gerber concerning their November 30, 2023 conversation. This is so because Mr. Gerber was the only witness to the only statement [C.J.] made about the accident following her 911 call."

{¶ 19} As to the remaining consideration under the second factor in *Baldonado,* the trial court noted that the rules of professional conduct precluded a lawyer from acting as both advocate and witness in a case at trial. Prof.Cond.R. 3.7(a). The trial court determined that Contreras demonstrated disqualification was necessary, and further determined that Gerber failed to show or even argue any exception applied to the prohibition on testifying, as provided by Prof. Cond. R. 3.7. The trial court, therefore, granted the motion to disqualify Gerber from the case, but only if C.J. is called as a

10.

witness in the case, giving the state a short deadline to file notice of their intent to call or not call C.J. at trial.

{¶ 20} The state filed a motion to reconsider, or in the alternative, a notice of its intent to appeal the disqualification order. The state argued that "Terri" and C.J. were separate individuals, and the recorded 911 call was not C.J.'s statement. The state further argued that an investigator reinterviewed C.J. and obtained a consistent statement from her, and "if necessary, that investigator would be able to testify as to any inconsistency." In its motion, the state did not address the fact that Gerber conducted the initial interview of C.J., two years after her 911 call, or explain how the reinterview by an investigator resolved the issues that arose from Gerber's initial interview.

{¶ 21} On December 8, 2023, the trial court denied the motion for reconsideration.

{¶ 22} The state filed a timely motion, seeking leave to appeal the judgment of disqualification, which we granted.

### III. Assignment of Error

{¶ 23} The state raises four assignments of error on appeal:

1. The trial court failed to follow the required two-step analysis for disqualification of an attorney based on claims that the attorney is likely to be a necessary witness, an error of law outside the trial court's discretion.

2. The trial court abused its discretion in disqualifying the lead prosecutor in a complex criminal case the week before trial when the disqualification was

founded on an erroneous factual assumption not supported by evidence of record.

3. The trial court abused its discretion in disqualifying the lead prosecutor in a complex criminal case the week before trial based on an erroneous conclusion of law that the prosecutor's anticipated testimony would be admissible for purposes of impeachment by means of extrinsic evidence.

4. The trial court abused its discretion in disqualifying the lead prosecutor in a complex criminal case the week before trial without considering the hardship caused to the State by virtue of the disqualification.

## IV. Analysis

{¶ 24} Each of the state's assignments of error challenge the trial court's decision, disqualifying Prosecutor Gerber should C.J. testify, as an abuse of discretion. The state argues that the trial court incorrectly applied the standard, based its decision on an erroneous factual assumption and erroneous conclusion of law, and ordered disqualification without considering the hardship caused to the state. Regarding hardship, the state emphasized the complexity of the criminal case and the court's decision, a week before the scheduled trial, an argument never raised in the trial court.

{¶ 25} The standard for disqualification, applicable here, is set forth in Prof.Cond.R. 3.7(a), which provides:

> A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness unless one or more of the following applies:

12.

(1)     The testimony relates to an uncontested issue;
(2)     The testimony relates to the nature and value of legal services rendered in the case;
(3)     The disqualification of the lawyer would work *substantial* hardship on the client. (Emphasis sic.).

We review the trial court's disqualification of counsel for an abuse of discretion. *State v. Johnson,* 2011-Ohio-6809, ¶ 9 (6th Dist.), citing *Clucas v. Vojtech,* 119 Ohio App.3d 475, 477 (9th Dist.1997). An abuse of discretion may be shown by demonstrating that the trial court's decision is unreasonable, arbitrary, or unconscionable. *State v. Callahan,* 2024-Ohio-5621, ¶ 55 (6th Dist.), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 26} In the first assignment of error, the state argues that the trial court erred in applying the two-part test of *Baldonado* in addressing disqualification under Prof.Cond.R. 3.7(a), rather than the test more recently applied in *In re Estate of Tuttle,* 2019-Ohio-5363 (6th Dist.). The *Baldonado* test required determination of admissibility, and if disqualification is necessary, whether an exception applies under Prof.Cond.R. 3.7(a). *Baldonado* at ¶ 20. Significantly, the issue on appeal in *Baldonado* concerned whether the attorney's testimony was necessary, with the conclusion that the testimony *was* necessary based on "the very fact that he alone can testify" regarding the relevant conversation at issue in the case. *Baldonado* at ¶ 21.

{¶ 27} In *Tuttle,* we found that, despite no evidentiary rule preventing trial counsel from testifying in a case, "trial courts 'have the inherent power to disqualify an attorney

13.

from acting as counsel in a case when the attorney cannot or will not comply with the Code of Professional Responsibility and such action is necessary to protect the dignity and authority of the court." *Tuttle* at ¶ 12, quoting *Baldonado* at ¶ 5 (additional citation omitted.). In considering the issue, we held that in determining whether "an attorney should be disqualified to prevent a potential violation of the Code of Professional Responsibility, the trial court must first determine whether the attorney is 'likely to be a necessary witness.'" *Tuttle* at ¶ 14, quoting Prof.Cond.R. 3.7(a)." If the attorney is likely to be a necessary witness, the court must then determine if one of the three exceptions listed in [Prof.Cond.R. 3.7(a)] apply." *Id.*

{¶ 28} Based on the decision of the trial court, we find the trial court considered the factors of *Tuttle,* despite citing to the test in *Baldonado.* While the trial court focused much of the analysis on the admissibility of Gerber's testimony, the court also clearly determined Gerber's testimony was necessary because C.J.'s testimony would address the "recklessly" element and only Gerber could be cross-examined regarding his initial interview of C.J. The trial court found: "This is so because Mr. Gerber was the only witness to the only statement [C.J.] made about the accident following her 911 call."

{¶ 29} While the factors in *Baldonado* and *Tuttle* differ, both tests require consideration of necessity. Here, the trial court clearly considered whether Gerber's testimony could be necessary, should C.J. testify, with the state failing to argue that any exception applied under the Rule. Accordingly, while the trial court referenced

14.

*Baldonado,* the trial court still considered all the factor's articulated in *Tuttle* in its application of Prof.Cond.R. 3.7(a). Accordingly, we find the state's first assignment of error not well-taken.

{¶ 30} The state's second and third assignments of error concern admissibility and the "necessary witness" determination. In arguing an abuse of discretion, the state argues that the trial court based the decision on erroneous facts and erroneous legal conclusions. We disagree.

{¶ 31} In *Tuttle*, we addressed disqualification under Prof.Cond.R. 3.7(a), noting "[t]he burden of proving that disqualification is necessary falls upon the moving party and the burden of proving disqualification would result in a substantial hardship is on the non-moving party." *Tuttle* at ¶ 9, citing *155 N. High, Ltd., v. Cincinnati Ins. Co.,* 72 Ohio St.3d 423 (1995), syllabus. We further found that the failure to apply the two-part analysis for disqualification based on Prof.Cond.R. 3.7(a) "can constitute an abuse of discretion." *Tuttle* at ¶ 13, citing *Chapair v. Chapair,* 2019-Ohio-3976, ¶ 15 (8th Dist.) (additional citations omitted.).

{¶ 32} As to whether the attorney is likely to be a necessary witness, the party seeking disqualification must demonstrate the challenged attorney will provide material and relevant testimony that is unobtainable from another source, with demonstration that "it is likely the attorney would need to testify." *Tuttle* at ¶ 15, citing *Krueger v. Willowood Care Ctr. of Brunswick, Inc.,* 2019-Ohio-3976, ¶ 13 (9th Dist.); *Baldonado v. Tackett,*

15.

2009-Ohio-4411, ¶ 21 (6th Dist.) (additional citation omitted.). Thus, the determination addresses admissibility as well as need. The state argues that Contreras could not demonstrate admissibility at hearing on his motion to disqualify because his argument of bias was "merely speculation," and the trial court "should not countenance the use of extrinsic evidence for impeachment based on bias when no bias or prejudice is apparent." The state argues the trial court's decision was based on the factual finding that the 911 caller identified as "Terri" and C.J. were the same person.

{¶ 33} Based on the record, the trial court was clear regarding the Terri/C.J. confusion. We find no instance in the record in which the trial court definitively found the two were the same individual, with the court's focus clearly on Gerber's initial interview that produced a new witness statement that went to the recklessness element of the state's case. In focusing on whether the caller identified as "Terri" and C.J. were the same individual, the state ignores the initial interview, and the fact that Gerber took the initial statement from C.J., without a third party present. The interview, moreover, produced a new witness statement which was either obtained from a 911 caller who gave a new statement that was opposite to the two-year-old 911 call in evidence and at issue in the mistrial, or was obtained from a 911 caller whose recorded statement from two years ago is unavailable for comparison to the initial statement provided two years after that 911 call. In either scenario, there is a new witness statement from a 911 caller that established the recklessness element for aggravated vehicular homicide.

16.

{¶ 34} Gerber's investigatory role in interviewing C.J. was raised by Contreras as a basis for calling Gerber as a necessary witness. Contreras noted that Gerber was the only individual who conducted an initial interview of C.J., and he must be able to question Gerber, under oath, regarding the context of this investigation, Gerber's training in conducting the investigation, and the types of questions he asked, to impeach C.J.'s testimony under Evid.R. 616(A). Thus, the factual determination regarding whether "Terri" and C.J. are different individuals is not the pertinent issue. C.J.'s statement to Gerber is the issue. Gerber is only the witness Contreras *could* cross-examine regarding the interview that produced C.J.'s statement. Contreras argued he should be able to question Gerber as he would any other investigator, noting, "This is why we have investigators make phone calls."

{¶ 35} Contreras correctly argues that he could reasonably expect to cross examine Gerber regarding C.J.'s initial interview, should she testify, as he would any police officer regarding the interview techniques used to procure C.J.'s statement. Police officers and investigators are properly cross-examined for this purpose. *See, e.g., State v. Wilson,* 2019-Ohio-5099, ¶ 16 (9th Dist.) (on cross-examination, investigating officer admitted using a "deceitful interview technique"); *State v. Young,* 2021-Ohio-2541, ¶ 48 (12th Dist.) (defense counsel could not inquire into what the witness said during her interview, but could "question the detective about his interview techniques and the basis for some of the questions that were or were not asked" during the interview); *State v. Corbin,* 2004-

Ohio-2847, ¶ 20 (8th Dist.) (the detective was cross-examined on his lengthy victim interview, with the detective stating "such interviews are conducted 'to make sure that we couldn't find any inconsistencies in her statements or answers.'"); *State v. Dye,* 2016-Ohio-986, ¶ 15 (3d Dist.) (detective was questioned on cross-examination regarding his training in interviewing techniques).

{¶ 36} Furthermore, prosecutors have standards to ensure they are not placed in the position of witness, called to testify regarding their interview techniques or to explain the questions asked in obtaining a statement. *See State v. Poe,* 1990 WL 40652 (2d Dist.) (Brogan,J., concurring), citing ABA Standards for Criminal Justice Sec. 3-3.1(f) (2d Ed.1982) (noting the standard requiring a third party's presence for a prosecutor's interview of a prospective witness to prevent possible withdrawal from the case in order to "present his impeaching testimony.")[1] .

{¶ 37} The trial court determined Gerber's testimony would be necessary, if C.J. was called as a witness, finding "unless in the unlikely circumstance that [C.J.] admits that her statement to Mr. Gerber was untrue, the only apparent way for Defendant to

---

[1] This standard is articulated at ABA Standards for Criminal Justice: Prosecutorial Investigations Standard 2.2(f), available at https://www.americanbar.org/groups/criminal_justice/resources/standards/prsecutorial-investigations/ ("The prosecutor should avoid being the sole interviewer of a witness, being alone with a witness, or otherwise becoming an essential witness to any aspect of the investigation"); *see also* U.S. Dept of Justice, Justice Manual, Section 9-5.002 (2018), available at https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings ("Whenever possible, prosecutors should not conduct an interview without an agent present to avoid the risk of making themselves a witness to a statement and being disqualified from handling the case if the statement becomes an issue.").

18.

attempt to impeach [C.J.]'s testimony on the 'recklessly' element would be to examine Mr. Gerber concerning their November 30, 2023 conversation. This is so because Mr. Gerber was the only witness to the only statement [C.J.] made about the accident following her 911 call." Therefore, the trial court's finding addressed Gerber as a necessary witness, with the trial court making the affirmative finding that Gerber was the only source for relevant impeachment testimony due to Gerber's decision to interview C.J. without a third-party present. Furthermore, C.J.'s testimony went to a contested element of the state's case, necessary for conviction. *See Tuttle* at ¶ 15 (the testimony must be "material and relevant' and 'unobtainable elsewhere.'). Therefore, considering the record, the trial court applied the correct law to the pertinent facts, and affirmatively found Gerber would be a necessary witness, should C.J. testify at trial.

{¶ 38} Accordingly, we find the state's second and third assignments of error not well-taken.

{¶ 39} In the remaining assignment of error, the state argues that the trial court failed to consider whether disqualification created a substantial hardship for the state. The burden of demonstrating a substantial hardship was on the state. *Tuttle* at ¶ 9, citing *155 N.High,* 172 Ohio St.3d 423, at the syllabus. As previously noted, the state raised no argument regarding any exception to disqualification under Prof.Cond.R. 3.7(a), including substantial hardship. As the state failed to assert any exception in the trial court, the trial court did not abuse its discretion in finding no exception to disqualification.

19.

{¶ 40} Therefore, appellant's fourth assignment of error is not well-taken.

## V.  Conclusion

{¶ 41} Finding substantial justice has been done, we affirm the judgment of the Lucas County Court of Common Pleas. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Christine E. Mayle, J.

Gene A. Zmuda, J.

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.